The HUMANE SOCIETY OF the UNITED STATES, et al., Plaintiffs,

v.

James G. WATT, et al., Defendants.

Civ. A. No. 82-2689.

United States District Court,
District of Columbia.

Nov. 29, 1982.

Ellen Bass, J. Peter Bryne, Michael A. Roth, Covington & Burling, Washington, D.C., for plaintiffs.

Dianne H. Kelly, J. Vance Hughes, U.S. Dept. of Justice, Washington, D.C., for defendants.

Patrick A. Parenteau, Washington, D.C., for amicus National Wildlife Federation.

C. King Mallory, III, Richard W. Goldman, Hunton & Williams, Washington, D.C., for amicus Wildlife Legislative Fund.

Paul A. Lenzini, William A. Hutchins, Chapman, Duff & Paul, Washington, D.C., for amicus International Ass'n of Fish and Wildlife.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

In this action, plaintiffs, an individual and two organizations, the Humane Society of the United States and the Maine Audubon Society, challenge the decision of the Department of the Interior, through the Fish and Wildlife Service (the Service), to permit sport hunting of black ducks during the 1982–83 hunting season. The Service issued the hunting regulations in question pursuant to the Migratory Bird Treaty Act (MBTA), 16 U.S.C. §§ 703–712, and, as relevant here, the Convention on the Protection of Migratory Birds (the Canadian Treaty), concluded between the United States and Great Britain (for Canada) on August 16, 1916, 39 Stat. 1702, T.I.A.S. No. 628. Black ducks are migratory waterfowl within the meaning of the MBTA and the Canadian Treaty. In accordance with the MBTA, the Service annually issues "frameworks" within which the several states may authorize hunting of migratory waterfowl within their borders, with any further restrictions as to season length or daily take of birds (bag limits) as they desire to impose. No hunting of migratory waterfowl may take place unless permitted by the Service. Plaintiffs seek to have the Service's 1982–83 hunting regulations for black ducks declared unlawful, arguing that the MBTA prohibits the Service from allowing any

hunting of a species of birds to continue when it is evident that the population of the species is declining and that the Service has failed to satisfy the requirements of section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C), and regulations promulgated thereunder, in that no adequate environmental impact statement preceded the issuance of the hunting rules at issue here. Following this Court's denial of plaintiffs' application for a temporary restraining order on September 28, 1982 (memorialized in a written order issued the following day) and expedited briefing, this case was tried to the Court on October 26 and 27, 1982.[1] Upon consideration of the arguments of counsel for the parties and *amici curiae,* the testimony adduced at trial, and the record in this case (including the administrative record), and for the reasons which follow, the Court denies the relief sought by plaintiffs and enters judgment in favor of defendants. The following constitutes the Court's findings of fact and conclusions of law.

Since 1955 there has been a sharp decline in the population of black ducks. As a result, since the late 1950s there has been substantial concern and debate about the species' situation. In consideration of the possibility that this decline could have been linked to the liberal hunting regulations then in effect (which, depending upon the year, established a bag limit of four black ducks and a 60- or 70-day season), in 1959 the Service imposed regulations sharply reducing the season length and bag limit. These reductions were altered from time to time over the years. They were the most restrictive in 1968, when a season of 40 days and a bag limit of two black ducks were prescribed. The 1982 regulations, at issue here, allow a 50-day season and a one- or two-duck bag limit.

1. Three *amici curiae* also participated in this case. The Wildlife Legislative Fund, a hunter group, and the International Association of Fish and Wildlife Agencies, representing various governmental entities, sought intervention as party defendants. Intervention was denied, but the Court treated the briefs already filed by them as *amicus* briefs and permitted them a closing argument at trial. The National Wildlife Federation, while not seeking intervention, submitted an *amicus* brief in favor of denying plaintiffs relief yet disagreeing with defendants' interpretation of the proper standard for judicial review of their actions. This brief was considered on the merits.

The regulations that are the subject of this action are the latest in a series of "stabilized" annual regulations for the hunting of black ducks, first adopted by the Service in 1976. 41 Fed.Reg. 43163 (Sept. 30, 1976). In that year, the Service began its plan to maintain for a period of several years a substantially constant season length and bag limit for black duck hunting. This program was discussed in the environmental assessment (the 1976 EA) which the Service issued to supplement its 1975 environmental impact statement (EIS) concerning the agency's annual process for the establishment of regulations governing the hunting of all huntable migratory waterfowl. In 1980 the Service expanded the stabilized regulations scheme to all waterfowl and continued it for black ducks. 45 Fed.Reg. 1365 (Feb. 29, 1980). An environmental assessment (the 1980 EA) was prepared on that action. A supplement to the 1976 EA (the 1982 EA Supplement) was issued on September 2, 1982; it presented additional information derived from research associated with the stabilized regulations for black duck hunting.

The rulemaking at issue contains the last annual stabilized rules for black duck hunting. In its public hearings and final rules this year, the Service announced that it intended to further restrict black duck hunting during the 1983–84 federal migratory bird hunting season. 47 Fed.Reg. 41254 (Sept. 17, 1982). The Service stated that it would prepare an environmental assessment on the proposal and try to develop with the Canadian and state governments a coordinated plan for such a reduction in harvest, but that it would go ahead with appropriate action next year if their concurrence and cooperation were not forthcoming.

The 1975 EIS concerned the proposal of the Department of the Interior to continue issuing annual regulations governing the sport hunting of migratory waterfowl so as to permit "levels of harvest compatible with perpetuation of these migratory bird resources." EIS, at 1. This report considered factors affecting the population of such birds, including hunting and habitat conditions. The report cast doubt on the utility of winter inventories as a means of accurately estimating the annual black duck population but noted that such surveys were useful in discovering population trends. The winter inventory involves direct visual observation of birds from low-flying planes. Winter inventory data for 1955 through 1974 revealed a downward trend in black duck population. The EIS also discussed population data derived from banding of birds during the winter and the recovery of these bands by hunters. This data showed that the harvest rate for black ducks remained high despite very restrictive bag limits. The authors of the EIS speculated that hunting might have been depressing the population, but also noted that, in contrast, recovery rates from winter bandings (a measure of hunting mortality, discussed *infra*) had remained fairly constant over 20 years. Further analysis of the relationship between hunting and survival in other ducks cited conflicting results of several studies, as well as a preliminary finding of compensatory mortality in mallards, *i.e.*, that natural mortality is higher in years when the rate of harvest is low (to compensate for decreased hunting mortality) and vice versa. The report concluded that further research was necessary to define more clearly the factors influencing the status of the black duck population.

From the time of the Black Duck Symposium, convened in 1968 to discuss the status of the black duck population, until the mid-1970s, biologists and waterfowl managers, including those in the Service, had based their assumptions about the black duck on studies which indicated a link between hunting and survival rates. A comprehensive five-year study published by Anderson and Burnham, two Service employees, in 1976 revealed that the studies previously relied upon had been based on a faulty statistical analytic technique which incorrectly skewed their results toward establishing a link between hunting and survival. No other statistical analysis had confirmed the existence of such a link. Anderson and Burnham also concluded that there is a

harvest rate threshold level above which hunting mortality becomes additive to total mortality and below which hunting takes birds which would otherwise die of other causes ("compensation").

The publication of the results of this study was followed by the 1976 EA, which discussed the program of stabilized regulations for black duck hunting that evolved from the EIS. The 1976 EA disclosed the Service's proposal to continue black duck hunting for four years at "optimum levels of recreational hunting consistent with the maintenance of the resource base," and to commence an intensive bird-banding program to establish a data base on these population characteristics against which later regulatory change could be measured: rates of survival (the population of a banded sample that survives harvest the following year), recovery (the proportion of a banded sample which is recovered from downed ducks by hunters and others in the field), and harvest (the percentage of the population which is harvested, as derived from the recovery rate and the estimated proportion of recovered bands actually reported). 1976 EA at 1. This report noted the effects of the program on the environment, stating that "[i]ndividual birds will be removed from the population, but the integrity of the resource base will be maintained." *Id.* It also noted that allowing hunting to continue would make certain that "[c]ritically needed" survival and harvest rate data could be obtained, through the winter banding program and reward bird study. *Id.* This program also announced research on black duck breeding and wintering grounds. The 1976 EA disclosed that the black duck had been surpassed by the wood duck as the primary breeding duck of the eastern United States; although the black duck ranked first in the eastern Canada duck harvest, it ranked third in the Atlantic Flyway, behind the mallard and wood duck. *Id.* at 9–10. It noted that breeding and wintering populations of mallards and wood ducks had increased greatly in the Atlantic Flyway, *id.* at 3, and that since the 1950's mallards had replaced black ducks as the principal breed-

ing species in western Ontario and eastern Manitoba. This change was attributed to mallard release programs, land use changes from forest habitat to agricultural lands (which mallards prefer), and the increase of beaver flowages (which may have made previously remote habitat accessible to mallards). *Id.* The report noted that black ducks are asocial by nature and have a widely dispersed breeding range, although they do tend to congregate in offshore areas during the winter. *Id.* at 7. The eastward extension of the mallard was said to have brought it into association with the black duck, leading to observed hybridization (interbreeding), although no "substantial data" were available to evaluate the consequences of this process. *Id.* at 7.

The 1976 EA discussed the population status of the black duck, concluding that it was not practical through direct aerial or ground observation (the method employed in the winter survey) to count the breeding population, but that indirect methods (statistical analysis of banding and harvest data) had shown that the pre-season population was less in 1976 than it was in the 1950s, when the estimate was 3.7 million birds. *Id.* at 7; EIS at 44. The 1976 EA noted a steady downward trend of about two percent a year evidenced by the Flyway-wide winter surveys in both the Mississippi and Atlantic Flyways, 1976 EA at 7–8, although no trend was indicated for the Northeast Region of the United States. It concluded that a significant reduction has occurred in wintering black duck populations. *Id.* at 8.

The 1976 EA chronicled the changes in hunting regulations for black ducks since 1953 and corresponding trends in the United States and Canadian harvest over the period. It noted that the Canadian proportion of the continental harvest of black ducks had risen from 35 percent in the period 1952–62 to 46.2 percent in 1975. An increase in the number of actual hunters in the eastern flyways was explained as a partial reason for an increase in the black duck harvest under restrictive regulations since 1964, and was said to more than com-

pensate for then-reduced season lengths and bag limits.

The 1976 EA concluded that the effect, if any, of increased harvest rates on black duck survival rates had not been determined. It reported that, despite data gaps, indirect estimates of the survival rates of the closely related black duck and mallard indicate that they probably survive at about the same rate. However, it noted lower survival rates for immature male and female black ducks than for mallard immatures, stating: "it is possible that gunning pressure is too great on immature birds in [certain major data-retrieval] areas." *Id.* at 12.

The stabilized regulation program was in effect from 1976 until 1980. Between 1978 and 1980, and as part of the stabilized regulations program, the Service conducted a "reward-band" study, involving an intensive banding effort, to estimate band reporting rates on black ducks, operating from the assumption that not all bands from shot and retrieved birds are reported by hunters. Record 9:C–1, at 2. In 1980, stabilized hunting rules were extended to all waterfowl, including black ducks, for five years, although the Service announced that species of special concern, such as black ducks, would be closely monitored annually. 1980 EA at 3. An important impetus for extending the program was the 1979 agreement by Canada to participate in a joint stabilized regulation program designed partially to facilitate research on a continentwide basis. Additionally, the reward band study was continued through 1980 because the pre-season banding effort had yielded insufficient data. 1982 EA Supplement, at 2. During the period 1976–82, the Service sponsored research by its employee Dr. Warren W. Blandin, and others, into the implications of banding data collected through 1976 for the role of hunting and hunting regulations in survival of various black duck population units, the relation of hunting mortality to total annual mortality, and other relationships. 1982 EA Supplement, at 3.

As reported in Dr. Blandin's doctoral dissertation (Record 7:K–13), those studies yielded the following conclusions:

1. An indirect population estimate for the period 1971–76 agreed closely with one made for the period 1967–70 and indicated a stable average annual level of 2.7 million birds in the fall migration, as compared with a decline demonstrated in the winter inventory.

2. Hunting accounts for a significant proportion (57 percent of adult males; 47 percent of adult females; 65 percent of immatures) of total annual mortality of black ducks, causing an average of 16.5 percent more of total mortality in young black ducks than in adults. Blandin concluded that this suggested that hunting may be of significance to the survival of young black ducks in the periods and locations from which the data was derived.

3. Tests of periods of liberal versus restrictive hunting rules did not demonstrate that hunting mortality was additive to natural mortality.

4. No correlation was demonstrated between the size of any annual harvest and the size of the immediately following winter inventory.

5. Using independent pre-season recovery rates and winter survival estimates based upon banding data, it was found in adult males only that survival rates decreased when recovery rates increased. Dr. Blandin testified that those high recovery rates were affected by long seasons (60–70 days) in the mid-to-late 1950s, when black ducks were more numerous.

Much of the debate throughout this case has centered on population estimates as indicators of the health of the black duck species. Plaintiffs and defendants have both relied on the two primary methods of estimating black duck population size: indirect estimates based on banding and harvest data and winter inventories by aerial and ground observations, conducted in the same locales each year. Indirect estimates, because they are based on statistical analysis of banding and harvest data, provide a

method by which margin of error can be calculated, although such calculation has not yet been done. Winter survey estimates, although useful at discerning trends, cannot reliably be used as an estimation of total annual population, because they lack a statistical framework by which individual observation can be tested. Indeed, since black ducks habitate wooded areas and are secretive, therefore being difficult to sight, the winter survey results are grossly estimated to count only one-third to one-fifth of the total population. Moreover, they are (almost by definition) not useful in predicting the birds' late summer or fall population, inasmuch as both regeneration (breeding) and mortality due to hunting are seasonal.

Because of the unreliability of winter inventory data for determining annual population, the Service properly did not limit its consideration to such information but also included the indirectly-derived data in its exploration of the black duck's situation.

The results of the two types of estimates often have been inconsistent. While the winter inventory index has dropped an average of 1.6 percent per year over the period 1962–82, banding and harvest data showed an average annual wintering population of 1.4 million black ducks for the 1967–70 period and 1.5 million for the 1971–76 period. Fall flight estimates, also based on banding and harvest data, indicate that the number of black ducks which survive all forms of mortality to enter the fall flight has remained stable since 1967 at about 2.7 to 2.9 million ducks.

In any case, the Service has considered both types of estimates in its decision-making process, mindful of their limitations. Although the Service has concluded that the population of black ducks has been declining, the contradictory data has left experts in dispute as to the gravity of the problem and the extent to which various factors are responsible.

Notice of the Service's proposal to establish hunting regulations for black ducks in the 1982 season that would be the same as those for the previous season, was published in 47 Fed.Reg. 16718, 16723–24 (Apr. 19, 1982). The Service stated its intention not to change the regulations pending the receipt of information from banding as well as other sources, and the completion of the Black Duck Management Plan (a joint project of the Service, the Canadian Wildlife Service, and the Atlantic Flyway Council). 47 Fed.Reg. at 16724. The Service similarly proposed to make no change in regulations governing certain other types of waterfowl. Public hearings on the proposed regulations were held by the Service on August 3, 1982. Representatives of plaintiff Humane Society, as well as other interested parties, attended and presented their views. *See* Record 2:F–3 (transcript of hearing). At that hearing, the Service reached these conclusions:

1. Nothing in the 1982 fall flight forecast justified a departure from the previously established stabilized rules.

2. The Black Duck Management Plan, adopted by the Atlantic Flyway Council, had not yet been reviewed or accepted by the Mississippi Flyway Council.

3. The species had been on a gradual but steady downward decline.

4. Much had been learned, and was being learned about black duck ecology, management, genetics and productivity.

5. Pre- and post-season banding study results from 1967–81 were still being analyzed.

6. Dr. Blandin's dissertation found no conclusive evidence that current black duck harvests are at a level that affects the ability of the population to maintain itself.

7. The data indicated that harvest may be falling too heavily on young birds who have not yet entered the breeding population.

8. The Atlantic Flyway Council had initiated steps to develop an approach to harvest restrictions that would lead to a 25 percent reduction in harvest in the major harvest states in the Atlantic Flyway.

9. It was appropriate to explore whether certain harvest restrictions could improve

the species' position, "particularly in relation to the possible problem of the recruitment of immatures [into the breeding population]".

10. More time was needed for the Service to discuss a restriction program with Canada (which now takes 50 percent of the total harvest of black ducks and contains 85 percent of the breeding grounds) in light of the Service's belief that a primary factor in the status of the black duck is a deterioration in the suitability of breeding ground habitat for black ducks and that Canadian input and cooperation is essential when looking at the total black duck resource and long-term welfare of that population.

11. The principal annual survey method for black ducks—the mid-winter survey—leaves a great deal to be desired in accuracy and precision.

12. A successful program for improvement of the black duck's situation requires the Service to get information to the hunters on the problems of the black duck, the methods to be used to address the problem, and the time schedule for application of such measures.

13. In looking at the question of black duck harvest restrictions in as refined a manner as possible and trying to do something meaningful, substantial attention should be given to the hunting of young black ducks on their breeding grounds early in the hunting season, since their average survival rate in the areas Blandin studied (43 percent) is below the average for mallards, while the survival rate for adult black ducks (63 percent for males, 55 percent for females) is not uncommon for puddle ducks.

14. Lower survival rates for immature black ducks do not necessarily indicate that hunting is a factor in their survival, but suggest that this is an area of concern that should be studied.

15. Although all of the problem (of gunning pressure on the breeding grounds) cannot be assigned to Canada, Canadian cooperation is required to resolve the specific problem of possible over-harvest of immature black ducks.

*See* Record 2:F–3, at 44ff. (transcript of hearing). The Service also expressed its hope to work with the Atlantic and Mississippi Flyway Councils as well as Canada in 1982 to define appropriate strategies to be used to reduce the harvest, and also its disagreement with plaintiff Humane Society of the United States that a crisis situation exists with respect to the black duck. *Id.*

On August 20, 1982, the Service provided the following additional reasons for retaining stabilized harvest restrictions:

1. The precise cause of the long-term decline in the winter survey is not known, but changes in land use in some portions of the breeding grounds, deterioration and loss of habitat, competition with mallards, and hybridization with mallards appear to be major factors.

2. Comprehensive analyses of banding and other data do not demonstrate that current levels of harvest are depressing the survival of adult black ducks to the point that they would adversely affect the population.

3. Drastic action of a complete prohibition of all hunting of black ducks in the United States is not justified.

47 Fed.Reg. 36581 (1982).

The Service further discussed the black duck problem in the Federal Register on September 17, 1982, and addressed comments and arguments submitted to the agency by plaintiff Humane Society. 47 Fed.Reg. 41252–69. The Service noted the limitations of the winter survey data, upon which the Humane Society relied for some of its conclusions, and stated that its arguments against the Service's intention to wait another year before changing hunting regulations for black ducks "demonstrates a lack of appreciation for factors which must exist before a change in management can have its most beneficial effect" (*e.g.,* coordination with other agencies). 47 Fed.Reg. 41253. These findings also were made:

1. Studies show that hunting is a "contributing factor" to the decline in the species population, and that the greatest

effect may be on immatures—a problem that harvest restrictions should remedy.

2. A unilateral closing of the United States season will not have the most beneficial results on a species, the bulk of whose breeding habitat is now in Canada, where 50 percent or more of the continental harvest occurs.

3. Time is required for public involvement to ensure that the affected public and governments participate in tailoring effective restrictions to the perceived problems created by harvest.

The Service concedes that despite contrary indications from indirect population estimates based upon analysis of pre-1977 data, the species has undergone a gradual decline to a fall flight population somewhere in excess of two million birds. As a result of studies indicating that hunting may be responsible for comparatively lower survival rates in immature black ducks, the Service has announced its intention to focus on that problem next year in the development of further hunting restrictions. The contending parties agree that the indicated decline calls for action, but disagree as to when it should have been done (this year or next) and to what degree (total closure or lesser restrictions).

The Service's authority to promulgate hunting regulations for black ducks arises from its powers and responsibilities under the MBTA, which was enacted in 1918 to effectuate the Canadian Treaty. The black duck is one of the migratory birds that were the subject of the Convention, and therefore is protected under the MBTA. Plaintiffs argue that because the MBTA is "a conservation measure," defendants have contravened the purposes of the act by promulgating regulations permitting the hunting of black ducks in the face of data showing that the population of the birds is declining.

■ Under the MBTA, hunting of protected birds is prohibited unless permitted by regulations issued by the Secretary of the Interior. 16 U.S.C. § 703. In determining "when, to what extent, if at all, and by what means, it is compatible with the terms" of the various migratory bird treaties to allow hunting, the Secretary (through the Service) is directed to give "due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times and lines of migratory flight of such birds." 16 U.S.C. § 704. As the Service issued its regulations following notice and comment in accordance with the Administrative Procedure Act, 5 U.S.C. § 553, in reviewing the rulemaking procedure this Court must consider whether, upon examination of the record, the Service's decisions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the applicable statutory factors. *E.g., Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1972); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 417, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1972).[2]

**2.** *Amicus* National Wildlife Federation suggests that the Court should apply a strict scrutiny test to determine whether defendants' actions here have a rational basis in the record. It argues that the intensity of the scrutiny a court should give to agency action depends upon several factors, including whether the action represents a major change in public policy, whether the action appears on its face to be contrary to Congressional intent, whether there has been an evidentiary proceeding below, and whether all relevant factors have been considered. It likens this case to *State Farm Insurance v. Lewis,* 220 U.S.App.D.C. 170, 680 F.2d 206 (1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 340, 74 L.Ed.2d 382 (1982), in which the Court of Appeals invalidated the agency's decision to rescind its automobile passive restraint rule issued under the National Highway

Traffic Safety Act. In that case, the Court of Appeals applied a stricter standard of review than in the normal case because of the agency's apparent departure from the "path marked by Congress." 680 F.2d at 229.

Yet the instant case is not one where the agency has reversed an earlier decision which followed exhaustive administrative inquiry and reasoned decisionmaking; rather, the matter at hand involves a continuation of an established program. Aside from the distinguishability of *State Farm Insurance,* the Court cannot find that the Service's decision to allow continued hunting of black ducks constitutes a "major deviation from the path marked by Congress in the MBTA," as the National Wildlife Federation suggests, in light of the agency's expressed intention to improve the ducks' situation and

The purposes of the MBTA incorporate by reference the objectives of the Canadian Treaty, which provides in relevant part:

Whereas, many of these species are of great value as a source of food or in destroying insects which are injurious to forests and forage plants on the public domain, as well as to the agricultural crops, in both the United States and Canada, but are nevertheless in danger of extermination during the nesting season or while on their way to and from their breeding grounds;

The United States ... [and] Great Britain ..., being desirous of saving from indiscriminate slaughter and insuring the preservation of such migratory birds as are either useful to men or are harmless, have resolved to adopt some uniform system of protection which shall effectively accomplish such objects ....

39 Stat. 1702. Articles II, III, IV, and VII of the treaty set forth certain measures toward achieving these objectives, including:

(1) closing the hunting season on migratory game birds, with a minor exception, between March 10 and September 1, with a three and a half month maximum season, and closing the whole year to hunting of birds defined as migratory insectivorous and non-game birds (Article II),

(2) closing for a number of years the hunting season of numerous migratory game bird species (Article III) and identifying certain others for restrictive regulations (Article IV),

(3) authorizing under regulations, and by permit, the killing of any migratory game, non-game, or insectivorous birds which, under extraordinary conditions, may become seriously injurious to the agricultural or other interests in a particular community (Article VII).

*Id.* at 1703–05.

■ This language reflects the treatying parties' acknowledgement of the usefulness to man of the hunting of these birds, which they specifically recognized as *game* birds. Therefore, it does not necessarily follow from the MBTA's evident purposes of conservation that the statute creates a presumption against hunting, as plaintiffs suggest. The treaty demonstrates an interest in preserving sufficient numbers of birds to provide an ample stock of game for hunting in future years. This is consistent with discussion in the Congressional Record about the bill which became the MBTA. *See, e.g.,* 55 Cong.Rec. 4819 (1917); 56 Cong.Rec. 7356–79 (1918). This is also consistent with 16 U.S.C. § 701, which includes among the duties and powers of the Department of the Interior "the preservation, distribution, introduction, and restoration of *game* birds and other wild birds" (emphasis added).

■ Moreover, the MBTA does not impose upon the Service a mandatory duty to prohibit the hunting of any species whose population, for whatever reason, is declining. The Endangered Species Act of 1973, 16 U.S.C. §§ 1531–1543, requires that the Service "do more than merely avoid the elimination of protected species. It must bring these species back from the brink so that they may be removed from the protected class, and it must use all methods necessary to do so." *Defenders of Wildlife v. Andrus,* 428 F.Supp. 167, 170 (D.D.C. 1977). However, the black duck is not on the lists of endangered or threatened species described in this act at 16 U.S.C. § 1533(c)(1). Indeed, the MBTA and the Endangered Species Act concern two distinct, although related, problems; to read the requirements of the Endangered Species Act into the MBTA would be to render the latter act to some extent superfluous. *See, e.g., FTC v. Manager, Retail Credit Co.,* 169 U.S.App.D.C. 271, 515 F.2d 988, 994–95 (1975) (presumption against interpretations of statutory provisions that render them meaningless).

the actions it plans to take toward that goal in the coming year. In any case, the Court agrees with the conclusion argued by the National Wildlife Federation in finding the Service's decision reasonable in accordance with the proper statutory standard.

■ At the time it presented its proposed regulations for this year's hunting season, the Service issued its objectives for those regulations. The Service's objectives were as follows:

(1) To provide an opportunity to harvest a portion of certain migratory game bird populations by establishing legal hunting seasons.

(2) To limit harvest of migratory game birds to levels compatible with their ability to maintain their populations.

(3) To avoid the taking of endangered or threatened species so that their continued existence is not jeopardized, and their conservation is enhanced.

(4) To limit taking of other protected species where there is a reasonable possibility that hunting is likely to adversely affect their populations.

(5) To provide equitable hunting opportunity in various parts of the country within limits imposed by abundance, migration, and distribution patterns of migratory game birds.

(6) To assist, at times and in specific locations, in preventing depredations on agricultural crops by migratory birds.

47 Fed.Reg. 16720 (1982). These objectives are in accordance with the MBTA and the Canadian Treaty, in that they provide for some hunting, although not to such an extent that would be harmful to the hunted species, and note factors that the MBTA requires the Secretary to consider (abundance, migration, and distribution patterns) in establishing hunting regulations under the act.

Plaintiffs' argument that the Service's black duck hunting regulations are inconsistent with paragraphs (2), (4), and (5) has no merit. As to paragraph (2), while plaintiffs' expert Dr. Grandy stated during the administrative proceedings and at the trial before this Court his belief that hunting at the levels established for the stabilized regulations program would interfere with the black duck's ability to maintain its population, there was ample evidence before the agency to the contrary. Indeed, plaintiffs' same expert was unable to inform the

Court, upon being asked at trial, by what percentage the black duck's population would decline over the 1982 season should hunting continue in accordance with the Service's regulations. Moreover, the evidence available to the agency presented the possibility that even if hunting of black ducks were not permitted, the phenomenon of compensatory mortality would take some birds that otherwise would be killed by hunters. In any case, the agency's decision to continue its stabilized regulations program for one more year before reducing the harvest next year is consistent with its duty under 16 U.S.C. § 701 to preserve and restore game birds. This decision represents the agency's conclusion that the benefits that would be gained by waiting (i.e., the opportunity for coordination with other agencies and the ability to obtain more information that could be statistically measured against data yielded in previous years where harvest regulations were identical) would be more valuable toward improving the black duck's population over the long run than applying stricter regulations for one year.

Likewise, the Service's decision to continue stabilized regulations for one more year does not offend the objectives set out in paragraph (4) because, given the uncertainty as to what detrimental effect an additional year of hunting at stabilized levels might have and the informational benefits that continuing stabilized regulations would yield, it cannot be said that there is a reasonable possibility that the hunting that is now permitted would adversely affect the black duck's population over the long run. Paragraph (5) addresses the need to keep hunting opportunities equitable from state to state—an issue that was the subject of some debate during the enactment of the MBTA (See 56 Cong.Rec. 7367, 7374–76)—within limits imposed by abundance, migration, and distribution patterns. All of these factors were considered by the agency in the rulemaking process. While plaintiffs disagree with the conclusions reached by the Service after studying these factors, the fact that they might have been drawn to

different conclusions does not prove that the agency ignored these considerations.

Plaintiffs' argument appears to require that the "population" that must be maintained be interpreted as the specific number of birds in the species existing at the commencement of the year's regulatory process. However, nothing in the MBTA or the Canadian Treaty suggests that this is so. The word in the sense in which the Service used it refers to the *whole* rather than a particular amount; something more akin to "group," or, in the Service's terminology, "resource base." Certainly, plaintiffs' interpretation would demand more of the Service than modern science could yield, in light of the conceded inaccuracy of current methods of counting birds.

The record is clear. The decision of the Service to continue stabilized regulations for one more year was neither arbitrary nor capricious. Rather, it involved a detailed examination of the relevant statutory considerations and conclusions rationally based thereupon. *See, e.g.,* 47 Fed.Reg. 41252–54 (1982). In promulgating the regulations in question here, the Service fully met its statutory duty. The utility of the maintenance of stabilized regulations over a period of years toward gaining more information about the black duck's situation negates any suggestion by plaintiffs that the Service has acted in bad faith or shirked from its responsibilities under law. The only remaining issue is whether the Service has violated the National Environmental Policy Act of 1969 (NEPA) in regard to that act's requirement that environmental impact statements be prepared in certain circumstances. Let us consider why the Service is found to be in conformance with the act.

Section 102(2)(C) of the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C), provides that federal agencies shall prepare an environmental impact statement for any proposed "major Federal action[ ] significantly affecting the quality of the human environment." [3] Plaintiffs argue that the reports prepared by defendants on regulations for hunting migratory birds including black ducks (which include the 1975 EIS, the 1976 EA on black ducks, the 1980 EA, and the 1982 EA Supplement) do not meet the requirements of NEPA as regards the promulgation of the 1982 rules. Plaintiffs assert that these documents failed to consider and adequately address relevant scientific studies. Moreover, plaintiffs argue that the discovery of "new information" required that a new EIS be prepared before the 1982 regulations were promulgated.

These arguments are without merit. As to plaintiffs' suggestion that the environmental documentation created by defendants did not consider essential scientific information, NEPA does not mandate the inclusion in an EIS or EA of every piece of information known to the agency. *Movement Against Destruction v. Trainor,* 400 F.Supp. 533, 552–53 (D.Md.1975). Such documents are not to be judged by a standard of perfection. *See, e.g., Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 436 (5th Cir.1981), citing *Environmental Defense Fund v. Corps of Engineers,* 470 F.2d 289, 297 (8th Cir.), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1972). Moreover, the "large number of relevant studies and reports" that defendants allegedly ignored or discussed inadequately include documents that were in fact discussed as well as papers which either be-

---

**3.** This section requires agencies to:

"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

42 U.S.C. § 4332(2)(C).

cause of their lack of depth or dearth of new information did not merit significant attention in the NEPA reports. *See* Defendants' Trial Brief, at 29–31. Indeed, regulations of the Council on Environmental Quality require that agencies endeavor to reduce paperwork by, *inter alia,* affording only minimal attention to issues lacking great significance. *See* 40 C.F.R. § 1500.4.

Likewise, plaintiffs' argument that defendants should have prepared a new EIS or EA before they issued this year's hunting regulations is meritless. An EIS is required only when an agency is preparing to undertake a "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). According to the legislative history of NEPA, the term "action" includes "project proposals, proposals for new legislation, regulations, policy statements, or expansion or revision of ongoing programs." *Scientists' Institute for Public Information, Inc. v. A.E.C.,* 156 U.S. App.D.C. 395, 481 F.2d 1079, 1088 (1973). Council on Environmental Quality guidelines provide that an EIS is to be supplemented if the agency makes "substantial changes" in the action that was the subject of the EIS "that are relevant to environmental concerns." 40 C.F.R. § 1502.-9(c)(1)(i). In the matter at hand, defendants have not embarked upon a new program or made substantial changes in the existing program but merely continued for one year the program of stabilized regulations proposed in the 1975 EIS. Therefore, this section does not require the preparation of a supplemental EIS.

 Plaintiffs argue that the continued decline of the black duck's population represents new circumstances which, along with "new information" available since 1975, require that a supplemental EIS be prepared. CEQ guidelines state that an agency shall supplement its EIS when "[t]here are *significant* new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (emphasis added). In the matter at hand, the Service had determined that the infor-

mation developed since the EIS and the 1976 EA on black ducks does not materially change the state of knowledge about the black duck, although it did supplement the 1976 EA. An agency's decision not to file a supplemental EIS pursuant to this section will be upheld if it is reasonable. *Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1024 (9th Cir.1980). The reasonableness of such a decision depends upon the environmental significance of the new information, the probable accuracy of the information, the degree of care with which the agency considered the information and evaluated its impact, and the degree to which the agency supported its decision not to supplement with an explanatory statement or additional data. *Id.* The decline in the population of the black duck is old news, and the reasons for the decline are still subject to debate. The size of the record created and the extent of study performed by the Service demonstrates the careful consideration afforded to the relevant matters by the agency. Moreover, the Service has continued to provide information updating the EIS by preparing the 1976 EA, the 1980 EA, and the 1982 EA Supplement. Finally, the agency has stated that it will prepare appropriate NEPA documents next year in accordance with its commitment to issuing more protective regulations for the 1983–84 season. For these reasons, the Court concludes that it was reasonable for the agency not to develop a supplemental EIS or new EA before the issuance of the final year's stabilized regulations for black duck hunting.

In light of the foregoing, judgment shall be entered this date, November 29, 1982, in favor of defendants.