**WEST BRANCH VALLEY FLOOD PROTECTION ASSOCIATION,** et al., Plaintiffs,

v.

**Michael P.W. STONE, in his official capacity as Secretary of the Army, et al., Defendants.**

Civ. A. No. 91–0558 HHG.

United States District Court, District of Columbia.

April 15, 1993.

Edward Lee Rogers, Karen M. Goxem, Rogers, Goxem & Krickenberger, Washington, DC, for plaintiffs.

**4**

Benjamin F. Wilson, Devarieste Curry, Beveridge & Diamond, Washington, DC, for Lock Haven Area Flood Protection Authority.

James R. Layton, Asst. U.S. Atty., Washington, DC, for defendants.

### OPINION

HAROLD H. GREENE, District Judge.

From the moment the decision was made to protect the City of Lock Haven from periodic bouts of flooding by constructing a series of dikes and levees, the West Branch Valley Flood Protection Association, a non-profit group in Pennsylvania ("plaintiff") has attempted to halt the project. Plaintiff alleges non-compliance by the Army Corps of Engineers and the Lock Haven Flood Protection Authority ("defendants" or "the Corps") with the provisions of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 et seq., the Water Resources Development Act ("WRDA"), 33 U.S.C. §§ 2201–2311, and Pennsylvania law, 53 Pa.Stat. § 2862. Pending before the Court are cross-motions for summary judgment. For the reasons stated below, the Court denies plaintiff's and grants defendants' motion for summary judgment.

### I.

The Army Corps of Engineers are in the midst of building the Lock Haven Local Flood Protection Project which, when complete, will protect the City of Lock Haven from the intermittent flooding of the West Branch of the Susquehanna River and Bald Eagle Creek, Pennsylvania. As planned, the Flood Protection Project is comprised of a levee-dike approximately seven miles in length and associated recreational facilities. The levee-dike structure itself will be located in Lock Haven and Castanea Townships.

Prior to beginning construction, the Corps proposed a series of alternative flood protection measures and evaluated the ecological,

environmental, and social impacts of the different proposals on the community. The findings of this research was incorporated into a 1975 Environmental Impact Statement ("EIS") which ultimately concluded that the project should go forward. As new information was developed or received, the Corps refined both the proposed project and the EIS in accordance with the data. A more detailed design was developed and proposed in the "Phase I General Design Memorandum" and, in 1980, the Corps supplemented the environmental impact statement to reflect the impact of the project as then proposed. Again, the Corps recommended that the project proceed. In 1987, the Corps revised the levee design, and issued the "General Design Memorandum II," ("GDM II") accompanied by a further Environmental Assessment ("EA") of the project's impact on the surrounding area. One of the concerns addressed in the EA was the possibility that the original design might disturb known Superfund hazardous waste sites near Lock Haven thus causing additional contaminant releases.[1] The 1987 EA documented the coordinated efforts of the EPA and the Corps to insure that the levee was engineered to be compatible with the EPA remedial measures at the hazardous waste site. At that time, the Corps made a finding that the project alterations posed no significant impact to the environment. Thus, the Corps concluded that further supplementation of the environmental impact statement was unnecessary. On August 20, 1987, Congress approved construction of the project. Pub.L. 100–109, 101 Stat. 730 (1987).

In October 1990, the Corps issued a second EA addressing the impact of levee realignment intended to avoid another hazardous waste site. The 1990 EA also addressed the potential problems posed by the contaminated soils and groundwater and incorporated a study which directly investigated those potential hazards. Again the Corps found that the realignment of the levee created no additional significant impact on the environment and therefore a supplemental environmental

---

1. The two hazardous and toxic waste (HTW) sites in the vicinity are the Drake Chemical site and the American Color & Chemical site (AC & C). The Drake plant is within the area protected by the flood protection project. Research performed in conjunction with the cleanup of these sites was used by the Corps in evaluating the proposed flood protection project.

impact statement was unnecessary. However, the Corps did publish a Supplemental Information Document ("SID") supplementing and clarifying all previous environmental decisions. Hazardous and toxic waste ("HTW") studies previously undertaken by the Corps, the Environmental Protection Agency and consultants are referenced in the SID. Moreover, the SID details the technical reasoning underlying the proposed project.

Pursuant to NHPA, the Corps performed eight studies of the archeological resources of the area and entered into a Memorandum of Agreement ("MOA") with the Pennsylvania Historic and Museum Commission, the Authority, and the Advisory Council on Historic Preservation in November 1988. In addition, the Corps prepared a plan to mitigate the levee's impact on local historical resources.

Finally, as required by the WRDA, the Flood Authority obtained the consent of an adjacent township. On March 14, 1991, the Corps, the Authority, and the City of Lock Haven signed the Local Cooperation Agreement authorizing the initiation of project construction. Immediately thereafter, plaintiff initiated this suit. Pending now before the court are cross-motions for summary judgment.

## II.

■ Summary judgment is appropriate if there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The non-moving party is given the benefit of all favorable factual inferences. *Washington–Baltimore Newspaper Guild v. Washington Post, Co.*, 621 F.Supp. 998, 1001 (D.D.C.1985). At the same time, Rule 56 places a burden on the non-moving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

As stated above, this crux of the present dispute is whether the defendants have fulfilled their numerous obligations under four statutes: NEPA, NHPA, WRDA, and Pennsylvania law. Each statute is addressed in turn below.

## III

■ NEPA requires federal agencies undertaking "major federal actions" which are likely to "significantly effect the human environment" to take a "hard look" at the environmental effect of the proposed project. 42 U.S.C. § 4332(C); *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). It is undisputed that the Lock Haven project triggers the requirements of the Act. While NEPA does not mandate any particular result, it requires the agency to follow particular procedures in its decision-making process. As part of this "hard look," the Corps must first prepare an environmental assessment ("EA") to determine how great an effect the proposed action will have on the environment. If the agency makes a "finding of no significant impact," no additional studies are necessary. 40 C.F.R. § 1501.4(a)–(b), 1508.9. However, if the agency determines that the proposed action will significantly impact the surrounding environment, it must prepare an environmental impact statement ("EIS") to consider more fully the consequences of the proposed action, any adverse environmental effects, possible alternatives to the proposed action, and mitigating measures. 42 U.S.C. § 4332(C). If the agency calculates that the benefits exceed the costs, the agency may approve the project.

■ After the completion of the EIS, which in the instant case was in 1975, the agency bears a continuing obligation to update its environmental evaluation in response to substantial changes to the proposed action or significant new circumstances. 40 C.F.R.

§ 1502.9(c)(1) (1992). The results of this later evaluation are published in a supplemental environmental impact statement ("SEIS"). Based on the findings of the SEIS, the agency must consider anew whether to proceed with the proposed project.

It is defendants' decision not to supplement the EIS that produced the present litigation. Plaintiff argues that the 1990 EA glossed over important environmental threats and that new soil permeability data requires the Corps to reevaluate the impact of the project by publishing a new SEIS.[2] In particular, plaintiff cites four areas requiring additional discussion: (1) HTW contamination from groundwater seepage; (2) ponding of hazardous wastes; (3) socioeconomic impacts; and (4) evaluation of additional alternatives to the proposed system of dikes and levees.

The defendants counter that there is no "significant new evidence" requiring a SEIS and accordingly now move for summary judgment on the grounds that they have fulfilled their NEPA obligations.

▆▆▆▆ The supplementation process is triggered when new information presents a "*seriously* different picture of the environmental landscape" such that another in-depth look at the environment is necessary. *Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir.1984). If the agency concludes that the new data is "of exaggerated impact," supplementation is not required. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989). As clarified by the regulations accompanying NEPA, supplementation of the EIS must occur when:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. § 1502.9(c)(1) (1992). In reviewing the agency decision not to supplement, the Court shall reverse the agency only if the action was arbitrary and capricious. *Marsh*, 490 U.S. at 385, 109 S.Ct. 1865.

### 1. *HTW Contamination from Groundwater Seepage*

Groundwater in the area generally flows away from the City of Lock Haven and towards Bald Eagle Creek. Plaintiff contends that the defendants should have prepared a SEIS to fully consider the risk that during flood events, the project will cause a reversal in the direction of the flow of groundwater (i.e. toward the City). Because the soils surrounding the site are contaminated with hazardous wastes, the plaintiff believes that the water will become contaminated, migrate to areas landward of the levee, and increase the residents' exposure to the contamination. Moreover, to the extent that HTW seepage was considered, plaintiff challenges the permeability rate used by the Corps to calculate the rate at which contaminated water would travel. Relying on the Gannett Fleming report, plaintiff contends that the permeability rate is approximately 10 times the originally-estimated rate. The more permeable the soil, the more quickly any contaminated water will flow towards the City.

Plaintiff further maintains that the 1980 EIS and 1987 EA entirely failed to address the issue of migration of HTW via groundwater to areas landward of the levee and that the 1990 EA inadequately considered the issue. While conceding that in 1989 and 1990, the Corps, the EPA, and outside consultants studied the project's impact on the area's HTW site, plaintiff nonetheless contends that this research, while incorporated into the 1990 SID, fell short of comprehensively addressing environmental concerns.

These allegations are unfounded. The documentation accompanying the 1990 HTW Investigation Phase II explicitly acknowledges that the project might cause groundwater reversal and landward seepage of contaminated groundwater. However, the Corps concluded that the such seepage would occur with or without the project and estimated that the contaminants would move a maximum of a foot a day during flood periods

---

**2.** Gannett Fleming Inc., Final Aquifer Pump Test Report, Drake Chemical Superfund Site, Lock Haven, Pennsylvania, 1992 ("Gannett Fleming report").

and significant migration would not occur. Specifically, the HTW Investigation Phase II, September 1990 states:

> [D]uring normal non-flood conditions (long-term), the proposed project will have no effect on the natural flow of groundwater. During flood events (short term), the head created by design flood stages will impede normal groundwater movement toward the river, to some extent greater than pre-project conditions, and could actually create reverse movement for short period until the river stages recede. However, calculations base on maximum flood stages and a permeability value of $1 \times 10^{-2}$ cm/sec for the aquifer indicate that horizontal groundwater movement landward of protection should be on the order of less than 1 foot per day. Therefore, during a typical flood event lasting three days, any potentially contaminated plumes within the aquifer might be expected to move a maximum of about 3 feet.

*Id.* at 5.

The conclusions of this study were based on a series of soil and groundwater samples from the area, and a "full suite of organic and inorganic analyses and hazardous characteristics laboratory tests were performed." 1990 EA at 10. Finally, the Corps concluded "that the benefits of prevention of flooding provided by the proposed project exceed the possibility of any effects to known or unknown contaminated areas within the aquifer." *Id.*

Plaintiffs also argue that, even if the Corps did consider the possibility of a reversal of groundwater flow, the permeability calculation was entirely in error. Relying on the Gannett Fleming report of 1992, plaintiff contends that, in fact, permeability rates were approximately 10 times higher than the original estimate. Given this allegedly new information, plaintiff urges that the project be halted until a more thorough investigation of groundwater movement and the threat of contamination can be performed.

The Court disagrees. This allegedly new information does not present "a *seriously* different picture of the environmental landscape." *Wisconsin v. Weinberger*, 745 F.2d at 418. First, the Gannett Fleming study results, performed in connection with the Superfund remediation at the Drake site, are not broadly applicable to the levee site. The Gannett Fleming study was based upon a single pumping well located in a buried river channel and a series of monitoring wells all of which were a significant distance from the levee. Contrary to the plaintiff's assertion, the study gave a wide range of permeability readings: "[v]alues ranged from 0.06 feet/day observed in the shallow well MW–M6 to the 204 feet/day observed at overburden well MW–M122." Gannett Fleming report at 7–2. The study attributes this wide range of readings "to formation and gradation changes within alluvial materials." *Id.* In short, the study draws the obvious conclusion—permeability readings can be extrapolated only to sites with similar physical characteristics. Because the Gannett Fleming study did not evaluate permeability rates at any point along the levee, it is inappropriate to challenge the environmental analysis of the levee based on those results. In fact, the Gannett Fleming report explains that the monitoring wells further from the test well (which are those closest to the levee) "are considered less reliable." *Id.* at 5–14.

Even if the permeability results were applicable to the levee area, the plaintiff would have to show that the incremental change in seepage will have a significant impact and will carry contaminants from the Drake and AC & C sites, beyond the point that those contaminants would have reached without the levee. Given the dubious applicability of the plaintiff's "new" information, the Court does not find that there is any "significant new information" warranting a SEIS.[3]

---

**3.** To the extent that this argument is really an attempt to challenge the Corps use of "sieve testing" rather than pump tests and computer modeling, the Court also denies the motion. Defendants have offered proof that the method used "in seepage calculations for the levee design were determined in accordance with standard engineering practice." Ditman Aff. ¶ 7. A clash of expert opinion is an insufficient grounds upon which to hold the decision not to issue a SEIS "arbitrary and capricious." *Marsh,* 490 U.S. at 379, 109 S.Ct. at 1862.

### 2. Beta–Naphthylamine

■ Likewise with plaintiff's contention that the Corps failed to take a "hard look" at the presence of beta-naphthylamine, a known carcinogen. According to the plaintiff, the Corps neglected to study the extent of groundwater contamination by beta-naphthylamine even though the contaminant's concentration in the aquifer was "1000 times level permissible without Superfund remediation." Pl.Brief at 39.

Plaintiff paints a picture of deliberate neglect of a very dangerous health risk. This is far from the truth. Certainly, beta-naphthylamine poses a very serious health risk. However, it was not a risk left unexamined by the Corps. To the contrary, the issue of beta-naphthylamine contamination was expressly examined in the Rogers, Golden & Halpern study of the Drake site. See Rogers, Golden & Halpern, *Hazardous and Toxic Waste Analysis: Drake Chemical Site*, Tables 4–19 through 4–24, July 1990. That study recognized that, while there were high levels of beta-naphthylamine contamination, "the majority of the groundwater contaminated plume [had] not migrated from the site." *Id.* at 13. Moreover, groundwater contaminant transport was, under normal conditions, away from the City. Therefore, during flood events, even though the direction of groundwater flow would be reversed, it would not move with speed sufficient to carry the contaminants back to the City. In addition, the reverse flow would occur with or without the levee but surface water transport of hazardous wastes, another way the contaminants will be transported towards the City, will be greatly reduced by the levee. HTW Investigation Phase II, September 1990 at 4.

As explained above, the Court will not reverse the Corps unless it finds its decision not to supplement the EIS to be arbitrary and capricious. *Marsh*, 490 U.S. at 377, 109 S.Ct. at 1861. In the instant matter, the Court finds that the Corps took a "hard look" at the issue of beta-naphthylamine contamination. In addition, for the reasons stated above, the Gannett Fleming permeability values do not present a *"seriously* different

picture of the environmental landscape." *Weinberger*, 745 F.2d at 418.

### 3. Ponding

Plaintiff's next challenge centers on the mitigation measures proposed to reduce potential ponding of contaminated water. Early in the project's development, the Corps identified ponding (i.e. flooding of low-lying areas landward of the levee) as a potential negative consequence of the levee project. The initial mitigation plan proposed four pumping stations and diversion of an underground stream to reduce ponding damage. In 1990, the Corps altered the mitigation plan. Three of the four pumping stations were eliminated and the Corps decided not to divert the stream. Also, in an effort to reduce the number of homes demolished by the project, the diameter of the ponding area was reduced from 48.2 to 21.7 acres. To handle the excess water that would pond as a result of these changes, the size of the pipes used to draw off the water was increased. 1990 SID at 6.

■ The changes in the mitigation plan, plaintiff asserts, requires the Corps to reopen the EIS and reevaluate the environmental consequences of the project. This too is dismissed for two interrelated reasons. First, NEPA requires only that the agency fairly evaluate the environmental consequences of the project. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352, 109 S.Ct. 1835, 1847, 104 L.Ed.2d 351 (1989). In so doing, the mitigation plan must be discussed in sufficient detail to demonstrate that the agency took a "hard look" at the impact of the project. However, NEPA does not require that a complete mitigation plan be actually formulated and incorporated into the EIS. *Id.* at 353, 109 S.Ct. at 1847. Consequently, as long as the mitigation measures discussed in the EIS are sufficient to demonstrate a realistic look by the agency at the adverse impacts of the project, the agency is free to finally adopt a modified mitigation plan. *Id.* at 352, 109 S.Ct. at 1847.

■ It is undisputed that the Corps identified and discussed ponding at the site in the 1980 General Design Memorandum, the 1987 General Design Memorandum II, and the

1990 SID. Review of those documents demonstrates that the Corps realistically evaluated the problems associated with ponding and attempted to temper the adverse effects. These refinements in the mitigation plan are not such "substantial changes" as to require supplementation of the EIS.

Second, "if the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id.* In the instant case, the Corps identified ponding as a potential problem but decided to alter the mitigation plan in order to reduce the number of houses destroyed by the project. Plaintiff presents no evidence, and the court finds none, indicating that the this trade off was in any respect an error in judgment on the part of the Corps.

### 4. *Consideration of Alternative Designs*

 The Court likewise rejects plaintiff's contention that the Corps failed to consider "all reasonable alternatives" to the wall-levee design that is now under construction. 42 U.S.C. § 4332(2)(C)(iii). While the plaintiff concedes that the Corps considered and rejected a variety of other flood reduction methods before selecting the wall-levee alternative, plaintiff contends that the Corps' documentation is inadequate because they failed to evaluate all combinations of non-structural alternatives.

An agency's "consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every reasonable alternative." *Headwaters, Inc. v. Bureau of Land Management,* 914 F.2d 1174, 1181 (9th Cir.1990). Given the infinite number of possible alternatives to any project, the Court will not require EIS supplementation every time a party can conjure up some unconsidered alternative. Before selecting the wall-levee alternative, the Corps evaluated the feasibility, protectiveness, and costs of approximately sixty project combinations, including both structural and non-structural possibilities. FEIS at 106–108. This more than meets the mandate of NEPA.

Nor does the Gannett Fleming permeability data alter this Court's opinion that the Corps adequately addressed ponding. In the motion for summary judgment, plaintiff argues that the "new" permeability values should cause the Corps to reevaluate the effects of ponding and supplement the EIS. This is unnecessary. As explained above, incremental increases in permeability do not really effect the Corps' conclusions as to the impact of this project. Without more, the Court declines to find the Corps' discussion and handling of ponding to be arbitrary and capricious.

### 5. *Socioeconomic Impacts*

 Plaintiff raises the specter of a tremendous increase in the tax burden caused by a future finding of City liability under Superfund. *See* 42 U.S.C. § 9607. This threat, plaintiff urges, was unaddressed by the Corps and merits supplementation of the EIS. The gist of plaintiff's theory is that a future release of contaminated groundwater caused by the levee could create an additional Superfund site. Under Superfund's broad liability laws, the City might find itself liable for the cost of cleanup.

This is too speculative an injury to support a claim of arbitrary and capricious agency action. To accept plaintiff's line of reasoning, the Court would have to find that the Corps inadequately studied the movement of and risk from contaminated groundwater such that the creation of another site warranting Superfund status was likely. As discussed above, the Court has already found that the Corps' consideration of the risk of a release of contaminated groundwater met its obligations under NEPA. Plaintiff provides nothing further to substantiate its claim that Superfund liability is likely to be imposed on the City.

Indeed, this argument entirely ignores the fact that two Superfund actions are presently being undertaken to remediate the area's existing hazardous waste problems. Presumably, at the completion of those remedial actions, the threat of other releases of contamination will be further reduced. Without more, the Court cannot find that the Corps'

**10**

consideration of the project's socioeconomic effects was inadequate.

## IV

The Corps moves for summary judgment on plaintiff's remaining claims under NHPA, WRDA and Pennsylvania law. Because the court finds that the defendants have fulfilled their obligations under these statutes, plaintiff's claims are dismissed and summary judgment is granted for defendants.

 First, plaintiff alleges violations of the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.* That statute and implementing regulations require the agency undertaking an action to, in consultation with the State Historic Preservation Officer ("SHPO"), identify affected properties included in or eligible for inclusion in the National Register and assess the action's impact on those properties. 16 U.S.C. § 470f; 36 C.F.R. § 800.3–800.6 (1992). As an additional safeguard, the Federal agency must give the Advisory Council on Historic Preservation an opportunity to comment on the proposed undertaking. *Id.* Subsequently, the federal agency and other interested parties should enter into a binding Memorandum of Agreement ("MOA") detailing the steps to be taken to moderate any adverse effects resulting from the project. Plaintiff concedes that the agency entered into a MOA but declares the MOA fatally flawed. Under plaintiff's theory, the original MOA is invalid because the Corps failed to amend the MOA when new data concerning Memorial Park became available.

 Plaintiff is unable to identify the specific statutory or regulatory requirement violated by the defendants. The regulations specifically state that they are to be implemented "in a flexible manner ... as long as the purposes of ... the Act and these regulations are met." 300 C.F.R. § 800.3(b) (1992). Indeed, the regulations nowhere require that the MOA be updated as new information is developed or received. The regulations indicate that a MOA may be amended but do not make amendment compulsory. 36 C.F.R.

§ 800.5(e)(5). Moreover, while the Corps are strongly encouraged to obtain an MOA, the regulations do not so mandate, and in fact even contemplate situations in which the SHPO and the agency are unable to reach agreement. 36 C.F.R. § 800.6(b) (1992).

Where, as here, the Corps performed eight studies of the area's archeological resources, discussed the project's impact on historic properties and entered into a valid MOA, the Court cannot say that the purposes of the statute have been violated. Accordingly, defendants' motion for summary judgment on plaintiff's NHPA claims is granted.

 Finally, plaintiff's claims under the WRDA and Pennsylvania Law, 53 Pa.Stat. § 2862 must be dismissed.[4] Plaintiff alleges that pursuant to the Pennsylvania law, the Corps were required to obtain the consent of townships not actually within but arguably affected by the project. The plain language of the statute rebuts this contention and provides that "[n]o such works or improvements shall be erected ... in any municipality not joining in the erection or construction thereof, unless such municipality shall first consent thereto." 53 Pa.Stat. § 2862 (1989). By its own terms, the statute does not apply to municipalities only tangentially effected by but not within the project. It is undisputed that all municipalities in which the project will be constructed have consented. Therefore, defendants' motion for summary judgment on these counts is granted.

## *Conclusion*

For the reasons stated above, summary judgment for plaintiff is denied and summary judgment on all counts is granted for the defendants.

---

4. On April 1, 1991, Castanea Township gave written consent to the project thereby mooting plaintiff's claim under the WRDA, 33 U.S.C. § 2213(j)(1).